No. 25-30326

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ST. CHARLES-GUILLOT INVESTMENT, LLC,
LULING LIVING CENTER, LLC
*Plaintiffs – Appellants*

v.

ONE SOURCE ROOFING, INCORPORATED,
JASPER CONTRACTORS, INCORPORATED,
ROOFCLAIM.COM, L.L.C, AND GAF MATERIALS, L.L.C.
*Defendants – Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
HON. BRANDON S. LONG, NO. 2:23-00030

**ORIGINAL BRIEF OF PLAINTIFFS-APPELLANTS**

Michael A. Mahone (#32567)
THE MAHONE FIRM LLC
5190 Canal Blvd., Suite 102
New Orleans, LA 70124
Telephone: (504) 564-7342

Harold J. Flanagan (#24091)
Thomas M. Flanagan (#19569)
James H. Gilbert (#36468)
Gabrielle A. Ball (#39111)
FLANAGAN PARTNERS LLP
201 St. Charles Avenue, Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235

Counsel for Plaintiffs-Appellants St. Charles-Guillot Investment, LLC
and Luling Living Center, LLC

**C\ERTIFICATE OF I\NTERESTED P\ERSONS**

The undersigned counsel certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.   GAF Materials, LLC
     Defendant-Appellee

2.   St. Charles-Guillot Investments, LLC
     Plaintiff-Appellant

3.   Luling Living Center, LLC
     Plaintiff-Appellant

4.   Rebekka C. Veith
     Kerry J. Miller
     Monica L. Bergeron
     Counsel for Defendant-Appellee

5.   Harold J. Flanagan
     Thomas M. Flanagan
     James H. Gilbert
     Gabrielle A. Ball
     Michael A. Mahone, Jr.
     Counsel for Plaintiffs-Appellants

The other defendants—Jasper Contractors, Incorporated; Roofclaim.com, LLC; and One Source Roofing, Incorporated—have settled and been dismissed with prejudice.

/s/ Harold J. Flanagan
Counsel for Plaintiffs-Appellants,
St. Charles-Guillot Investments, LLC and
Luling Living Center, LLC

ii

## STATEMENT REGARDING ORAL ARGUMENT

This diversity case concerns the dismissal of a roofing-materials manufacturer that performed a negligent roof inspection. That negligence led to catastrophic damage when the roof of a nursing home detached during low-grade Hurricane Ida winds.

The owner of the nursing home sued, and the entity that performed the deficient inspection sought summary judgment. It argued that it owed no duty to the plaintiff and, even assuming duty, that there was no breach. Those questions are fact-intensive and rife with disputed facts. Among other things, the defendant's representative confirmed that the inspector should be trained to note non-compliance with good roofing practices and that the property owner has an expectation interest in that inspection. Roofing experts confirmed various ways that the roof installation was deficient and the many ways a prudent inspection should have identified those shortcomings.

The district court nevertheless granted summary judgment in the defendant's favor after mistakenly crediting the defendant's view that its intention was to conduct a narrow, surface-level inspection for its own benefit only.

Given the fact-intensive and record-heavy nature of this case, Luling requests oral argument to assist the Court in discussing the contents of the summary judgment record.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ......................................................... iii

TABLE OF CONTENTS ........................................................................................... iv

TABLE OF AUTHORITIES ..................................................................................... viii

STATEMENT OF JURISDICTION ............................................................................... 1

I.    INTRODUCTION .......................................................................................... 2

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................................... 4

III.  STATEMENT OF THE CASE ........................................................................... 5

     A.    Factual Background. ........................................................................ 5

           1.    Luling contracts with One Source to install a
                 GAF roof system. The contract represents that
                 the manufacturer—GAF—will "inspect and
                 certify" the new roof system. .................................................... 5

           2.    GAF inspects the roof installation to confirm
                 that it meets all GAF specifications, which
                 includes ensuring compliance with good roofing
                 practices. ............................................................................... 7

           3.    GAF's inspector fails to note that the roof
                 does not conform to good roofing practices,
                 building codes, and other GAF specifications. .......................... 9

           4.    Only a few months after installation, the poorly
                 installed roof detaches from the nursing home. ...................... 12

     B.    Procedural History. ....................................................................... 13

1.   Luling sues One Source and GAF for negligence
     in installing and inspecting the roof system. GAF
     argues that it has no duty, but the district court
     denies its motion to dismiss. .......................................................13

2.   GAF seeks summary judgment on duty and breach.
     The district court—crediting GAF's unilateral
     narrowing of the scope of its inspection—grants
     summary judgment. ................................................................. 14

3.   Though the district court's original opinion
     overlooked key evidence and failed to credit all
     evidence in Luling's favor, it stands by its ruling
     and denies reconsideration.   ...................................................15

IV.   SUMMARY OF THE ARGUMENT ..................................................... 16

V.    LAW AND ARGUMENT ................................................................. 18

A.    Review is *de novo* and all evidence must be viewed in
      Luling's favor in determining whether GAF had and
      breached its duty. ............................................................... 18

B.    By inspecting the roof to determine whether it met
      GAF specifications and good roofing practices, GAF
      assumed a duty to perform an inspection in a reasonable
      and prudent manner. ........................................................... 19

1.   A person who undertakes a task—even one that
     he otherwise has no obligation to perform—must
     perform that task in a reasonable and prudent
     manner................................................................................20

2.   By undertaking an inspection of the roof installation,
     GAF assumed a duty to inspect the roof in a
     reasonable and prudent manner............................................... 23

a.  *Malta* applies in this diversity case, and it confirms that a party—like GAF—does not get to narrowly define the scope of its inspection duty. ............................................... 24

b.  Yet even if GAF could define the scope of its own duty, it acknowledged its obligation to inspect for compliance with good roofing practices and local building codes. .................................. 29

c.  GAF's duty to inspect the roof in a reasonable and prudent manner encompasses the risk that a deficient inspection will harm the property owner .................................................................. 33

3.  The district court wrongly disregarded *Olympic Products*—the closest parallel to these facts— and gave undue weight to *Duplantis v. Miller*. .......................... 39

a.  *Olympic Products* persuasively recognized a duty owed to the property owner by a roofing manufacturer who conducted a deficient inspection. ................................................... 39

b.  The district court's reliance on *Duplantis v. Miller*—where the roofing manufacturer played no role in any inspection—was misplaced. .................................................. 42

C.  GAF breached its duty to inspect the roof in a reasonable and prudent manner. The district court erred in finding no breach because GAF unilaterally claimed it would perform a "surface inspection." .......................................... 44

1.  The district court found no breach because it erroneously credited GAF's evidence that it would conduct a "surface inspection" only. ......................... 44

2.      Whether GAF's inspection was reasonable is a disputed fact question. Roofing experts confirmed numerous ways in which GAF's inspection fell short. ................................................. 45

VI.    CONCLUSION ............................................................................. 51

CERTIFICATE OF SERVICE ..................................................................... 53

CERTIFICATE OF COMPLIANCE ............................................................. 54

# TABLE OF AUTHORITIES

## Cases

*Alley v. Courtney*,
448 So. 2d 858 (La. App. 2 Cir. 1984) ........................................................ 35

*Barrie v. V.P. Exterminators, Inc.*,
625 So. 2d 1007 (La. 1993) ................................................................ 33-34

*Broussard v. State ex rel. Off. of State Bldgs.*,
2012-1238 (La. 4/5/13), 113 So. 3d 175 ................................................ 45

*Bujol v. Entergy Servs Inc.*,
2003-0492 (La. 5/25/04), 922 So. 2d 1113 ............................................ 28

*Bunge Corp. v. GATX Corp.*,
557 So. 2d 1376 (La. 1990) ..................................................................... 35

*Cenac v. Orkin, L.L.C.*,
941 F.3d 182 (5th Cir. 2019) ........................................................ 21-22, 41

*Crane v. Exxon Corp., USA*,
613 So. 2d 214 (La. App. 1 Cir. 1992),
*judgment amended*, 633 So. 2d 636 (La. App. 1 Cir. 1993) .............. 21-22

*Dartlone v. La. Power & Light Co.*,
33,597 (La. App. 2 Cir. 6/21/00), 763 So. 2d 779 ................................. 23

*Duplantis v. Miller*,
2014-1070 (La. App. 3 Cir. 3/4/15), 159 So. 3d 1153 ...................... 42-43

*Favela v. Collier*,
91 F.4th 1210 (5th Cir. 2024) ................................................................ 19

*Malta v. Herbert S. Hiller Corp.*,
2021-00209 (La. 10/10/21), 333 So. 3d 384 ................................. *passim*

*Moore v. Pride Offshore, Inc.*,
No. 98-0569, 1999 WL 705548 (E.D. La. Sept. 9, 1999) ..................... 23

*Morvant v. Oil States Int'l, Inc.*,
   3 F. Supp. 3d 561 (E.D. La. 2014) ........................................ 20

*Olympic Prods. Co. v. Roof Sys., Inc.*,
   363 S.E.2d 367 (N.C. Ct. App. 1988) .......................... 39-42, 44

*Parker v. Barriere Constr. Co.*,
   No. 23-2010, 2024 WL 3677167 (E.D. La. Aug. 5, 2024) ................. 18

*Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co.*,
   268 S.E.2d 12 (N.C. Ct. App. 1980) ........................... 40, 42

*Robertson v. Blanchard Contractors, Inc.*,
   No. 11-1453, 2012 WL 2407784 (E.D. La. June 25, 2012) ................. 45

*Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*,
   No. 13-0366, 2015 WL 6758258 (E.D. La. Nov. 5, 2015) .............. 19-20

*Teaver v. Seatrax of Inc.*,
   No. 10-1523, 2013 WL 1288614 (E.D. La. Mar. 27, 2013) ................. 20

*Teter v. Apollo Marine Specialties, Inc.*,
   2012-1525 (La. App. 4 Cir. 4/10/13), 115 So. 3d 590 .................. 22-23

*Westover Prods., Inc. v. Gateway Roofing Co.*,
   380 S.E.2d 369 (N.C. Ct. App. 1989) ................................. 35

**Statutes**

28 U.S.C. § 1291 ........................................................... 1

28 U.S.C. § 1332 ........................................................... 1

La. Civ. Code art. 2315 .................................................... 18

**Other Authorities**

Restatement (Second) of Torts § 324A (Am. Law Inst. 1965) ................. 28, 38, 42

## STATEMENT OF JURISDICTION

The district court had jurisdiction over St. Charles-Guillot and Luling Living Center's (together, "Luling's") claims under 28 U.S.C. § 1332 because there is complete diversity between Luling and all defendants.[1]

On April 28, 2025, the district court entered a final judgment.[2] Luling filed a timely notice of appeal on May 23, 2025.[3] This Court has appellate jurisdiction under 28 U.S.C. § 1291.

---

[1]     ROA.50-51.

[2]     ROA.7597.

[3]     ROA.7598.

## ORIGINAL BRIEF OF PLAINTIFFS-APPELLANTS

Appellants, St. Charles-Guillot Investment, LLC and Luling Living Center, LLC, urge the Court to reverse the district court's grant of summary judgment in favor of GAF Materials, LLC.

## I.    INTRODUCTION

The plaintiffs (Luling) own and operate a nursing home facility. Luling had a new roof system installed. Soon after, the poorly inspected and poorly installed roof was ripped from the building during low winds of Hurricane Ida.

Before agreeing to the new roof, Luling was told that the roofing system would be "inspect[ed] and certif[ied]" by the manufacturer. So, before the job was complete, the manufacturer came to inspect the roof installation as planned. The manufacturer's corporate representative confirmed that its inspection should ensure that the installation complied with the manufacturer's specifications: those specifications embodied (1) good roofing practices and (2) compliance with local building codes.

The roof installation did not comply. There were numerous deficiencies with the installation, but the inspector failed to note them. He noted just one deficiency, communicated it to the roof installer, and it was corrected that day. But numerous other deficiencies went unmentioned and uncorrected.

The company that employed the inspector (GAF) argued that it owed no duty to Luling and, alternatively, there was no breach. GAF claimed that (1) its intention was to perform a surface-level inspection for the purpose of issuing a warranty and (2) the inspection was for its own benefit. Though that unilateral intention was not communicated to or agreed to by Luling, the district court credited GAF's premise and allowed it to set the scope of its own inspection and resulting duty.

That ruling conflicts with what the Louisiana Supreme Court recently held in *Malta v. Herbert S. Hiller Corporation*. Absent some agreement by all parties in advance, an inspector does not get to unilaterally narrow the scope of its own inspection to disclaim liability for harms resulting from an insufficient inspection. Foreseeable injuries that follow a deficient inspection fall within the scope of a duty to conduct a reasonable inspection. An inspector's subjective motivation for the inspection does not govern. Undertaking an inspection requires that it be done reasonably. A defendant that fails to do so is responsible for all foreseeable harm that results.

For similar reasons, GAF's argument that there was no breach likewise fails. That argument is premised on the notion that GAF could unilaterally narrow its scope to a "surface inspection" only. Because that premise is wrong, so is GAF's conclusion that it breached no duty because it could not detect any deficiencies from a surface inspection. GAF has no right to insist its inspection was narrowed in that

3

way. Yet even if it somehow were, its inspection *still* fell below the reasonable standard of care.

Breach is a classic fact question for the jury. Roofing experts confirmed that there were numerous deviations from good roofing practices and local laws, yet GAF's inspector failed to note them. And the inspector did not have to dismantle the roof to identify them: interviews, requesting photos and test results, and visual review of different aspects of the roof would have revealed the installation defects. Those should have been communicated to the installer and corrected for Luling's benefit in accordance with the protocol—just as the sole defect identified by the inspector was.

All record evidence should have been construed in Luling's favor, yet the district court failed to do so. It erred by granting summary judgment in favor of GAF and dismissing Luling's claims. This Court should reverse and reinstate Luling's claims against GAF for trial.

## II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**Duty:** One who performs an inspection has a duty to do so fully and reasonably and is liable for the foreseeable harm that flows from a deficient inspection. GAF argued that it owed no duty to Luling because GAF articulated—*after* the inspection and *after* Luling's losses—that its motivation for the inspection was a narrow one for GAF's own benefit. The district court adopted GAF's theory. Did the district court err in allowing GAF to unilaterally narrow the scope of its inspection duty?

4

**Breach:** Whether an inspection was reasonable under the circumstances is a fact question. The district court credited GAF's theory that its inspection was a "surface" one that could not have identified any defects. The evidence showed that GAF's inspection was not meant to be so limited, but even if it were, the inspector failed to take many reasonable steps. Did the district court err by resolving these disputed facts and taking this fact question from the jury?

## III.    STATEMENT OF THE CASE

### A.    Factual Background.

#### 1.    Luling contracts with One Source to install a GAF roof system. The contract represents that the manufacturer—GAF—will "inspect and certify" the new roof system.

St. Charles-Guillot Investment, LLC owns commercial property in Luling, Louisiana. Luling Living Center, LLC operated a nursing home on that property pursuant to a lease with St. Charles Guillot.[5] Luling met with One Source Roofing, Inc. regarding work it wanted performed on the nursing home's roof.[6] One Source told Luling that it could properly install a mechanically fastened thermoplastic polyolefin ("TPO") roofing system manufactured by GAF.[7] After confirming with One Source that the roof system could withstand hurricane winds, Luling Living Center contracted with One Source to install the roof system.

---

[5]    ROA.2228-22230, Luling depo. (Guillot).

[6]    ROA.2246-2247, One Source Roofing depo. (Wedding).

[7]    ROA.2232-2233, Luling depo. (Guillot).

5

The contract between One Source and Luling provides that "[u]pon completion of the job, *the manufacturer's [GAF] representative will inspect and certify the new roof system* and will then present a NDL (no dollar limit) total system warranty to the building owner."[8] In other words, though GAF was not mentioned by name and was referred to in the contract as "the manufacturer's representative," the representation was made to and understood by Luling that there would be an inspection that would result in a certification by a representative of the manufacturer following that inspection. And notably, the parties' contract made no mention that GAF's inspection would be "limited to a surface inspection only" or an inspection for GAF's "sole benefit."[9] So, Luling was never told anything of the kind, never agreed to any such terms, and had no reason to expect such limitation. What Luling agreed to and expected was a new roofing system installed by One Source that was inspected and certified by the manufacturer, GAF.[10]

Indeed, though Michael Guillera, the administrator of the Luling Living Center, did not know that GAF specifically was the entity that would be conducting the inspection, he knew that an inspection was being conducted.[11] He expected that

---

[8]    ROA.2252, contract between One Source and Luling Living Center (emphasis added).

[9]    *Compare* ROA.2252, contract, *with* ROA.1939, after-the-fact guarantee.

[10]   ROA.2252, contract.

[11]   ROA.2255, ¶ 5, Guillera declaration.

(1) the inspection would be conducted properly, (2) the inspection would determine whether the roofing system was properly emplaced, (3) Luling would be entitled to rely on that inspection, and (4) Luling would learn if any deviations from good roofing practices were identified.[12]

Clint Guillot, Luling's owner, was not aware of all the specific details, but he understood that "[s]omebody was supposed to go inspect" the roof.[13]

> **2.    GAF inspects the roof installation to confirm that it meets all GAF specifications, which includes ensuring compliance with good roofing practices.**

Before the roof installation was completed, GAF sent its employee, Bobby Whitman, to inspect the installation.[14] GAF's corporate representative confirmed that GAF's inspections are meant to ensure that the GAF-manufactured roof system was being installed by One Source in a way that conformed to GAF specifications, which specifications embody compliance with local building codes and good roofing practices.[15] If the roof installation did not meet these guidelines, Mr. Whitman was

---

[12]   ROA.2255, ¶ 6.

[13]   ROA. 2234-2235, Luling depo. (Guillot).

[14]   ROA.2270, GAF depo. (Whitman) (GAF sent him to do "an inspection to review the roof to see if it would be acceptable for the GAF warranty").

[15]   ROA.2293, GAF depo. (Harris) (discussing deposition exhibit 56, GAF Roofing System Overview & General Requirements Manual: "Q. Okay. If you look to the right under 'inspections,' it says: 'Should a GAF field services representative observe conditions on the job site but do not conform with the requirements of this manual or standard good roofing practices such conditions will be brought to the attention of the roofing contractor.' You

to point that condition out to the installers for correction.[16]

Mr. Whitman noted one (and only one) issue with the installation: a hollow spot on the roof. He created a "punch list," which identified that issue and instructed One Source to fix it.[17] One Source fixed it.[18] The installation job was not complete until GAF conducted its inspection and created a punch list of any items

---

see that? A. I do. Q. . . . Shouldn't we expect the field services representative to note non-compliance with the manual or specifications, isn't that a -- an expectation? A. It is an expectation. . . . Q. The representative ought to be trained enough to note non-compliance, right? A. Yes."); ROA.2286, GAF depo. (Harris), (discussing deposition exhibit 57, GAF TPO Specifications: "Q. . . . It says: 'All work shall be performed in a safe, professional manner, conforming to all federal, state and local codes.' A. Correct. Q. That's what GAF recommends? A. Yes. Q. That's good roofing practice? A. It is."); ROA.2287, GAF depo. (Harris) ("Q. Okay. Let's look at Number 5. 'All applicable code requirements must be met for recover over an existing roofing system.' That's what GAF recommends? A. Yes. Q. Cause that's good building practice. A. Correct.").

[16] ROA.2293 (discussing deposition exhibit 56, GAF Roofing System Overview & General Requirements Manual: "[I]t says 'Should a GAF field services representative observe conditions on the job site [that] do not conform with the requirements of this manual or standard good roofing practices such conditions will be brought to the attention of the roofing contractor.' You see that? A. I do."); ROA.2264, GAF depo. (Whittman) ("Q. – you were telling the contractor in [Exhibit H, Field Services Report] go check it out. A. Right. Q. If it's a problem, fix it. If it's not a problem, move on. A. Exactly. Q. Follow up with me. A. Follow up with GAF, yes Q. Kind of like your supervisor does with you. A. I don't – I would – I guess so.").

[17] ROA. 2298-2303, Field Services Report; ROA.2262-2263, GAF depo. (Whitman), ("It says: 'Findings: Hollow spot in deck, contractor to review and repair'. Right? A. Correct."); *see also* ROA.2316, Schaack depo. (GAF roofing expert), ("Q. [GAF] identifies deficiencies to the contractor; it asks the contractor to correct them; and then according to the protocol, it follows up by asking for photographs of that correction; true? A. True.").

[18] ROA.2274-76, La Vine depo.; *see also* ROA.2272, La Vine depo. (One Source is to follow GAF's "guidelines"); *see* ROA.2245, One Source Roofing depo. (La Vine is the person "most knowledgeable about" the relationship with GAF). Mr. La Vine worked as an employee of One Source, including performing work on the Luling Living Center.

warranting correction.[19]

GAF ultimately issued a guarantee to Luling. That demonstrated that GAF believed the installation complied with all GAF specifications, building codes, and good roofing practices.[20]

Luling received that "guarantee" in October, *after* Hurricane Ida.[21] That "guarantee"—never signed by Luling and received in October after the Spring 2021 installation and August 2021 damage to the roof—purported to narrow the inspection as having been a "surface inspection only" conducted "for GAF's sole benefit."[22]

> **3.    GAF's inspector fails to note that the roof does not conform to good roofing practices, building codes, and other GAF specifications.**

Mr. Whitman's inspection of the roof installation on behalf of GAF was

---

[19]    ROA.2263, GAF depo. (Whitman) ("Q. . . . The job's not done until the punch list is done, right? . . . A. . . . Correct.").

[20]    ROA.2291, GAF depo. ("Q. [T]hat's appropriate, right, that a guarantee should not be issued if the work doesn't comply either with the manual or the specification? A. Yes."); ROA.2291-2292 ("Q. [That a guarantee was issued] tells us at least that GAF believed that the work was in compliance with the manual or the specifications? A. They met the acceptable minimum standard, yes. Q. . . . the acceptable minimum standards contained in the manual or the specification? A. Yes.").

[21]    ROA.2324-2325, Keli Berard depo. ("Q. So is that the first time you received a copy of that guarantee from GAF? A. Yes, ma'am. Q. . . . And that was post-Hurricane Ida? A. Yes, ma'am.").

[22]    ROA.1939, guarantee.

deficient. Contrary to reasonable inspection procedures, there is no evidence that he

confirmed or investigated, for example:

- Whether the roof deck was "plywood," which is how it was described on warranty documents;[23]

- Whether the roof structure was inspected from the building's interior;[24]

- Whether any "cores" were taken and examined to correctly identify the roof deck;[25]

- The deteriorated condition of the wood nailers in zones two and three;[26]

- The lack of pull test results.[27]

Mr. Whitman also could have talked to the building owner, asked to see

photographs of certain roofing tests (like core and pull tests),[28] and gone inside the

---

[23]    Special-purpose buildings, like a nursing home, may not use combustible materials (like plywood) per roof codes. ROA.2330-2331, 2342, Fischer depo. (Luling roofing expert).

[24]    ROA.2332, Fischer depo.

[25]    ROA.2333, Fischer depo.; ROA.2275, La Vine depo. A "[c]ore cut" is made to "determine how many roofs are on there and if the roof is wet and . . . what condition the existing roofs would be in." ROA.2269, GAF depo. (Whitman); ROA.2290, GAF depo. (Harris) (GAF informs contractors that they need to take cores to determine what the underlying roofing material is to comply with good building practice).

[26]    ROA.2334, Fischer depo.

[27]    ROA.2358, Fischer report; ROA.2273, La Vine depo. ("Q. So One Source for the Luling Living Center job did not do a pull test? A. No, sir, I don't believe. They didn't do an independent pull test."). A "pull test" determines the amount of load bearing pressure that a fastener will withstand without failing. ROA.2289, GAF depo. (Harris).

[28]    ROA.2268-2269, GAF depo. (Whitman) ("For example, do you know whether a core was taken of the roof prior to the contractor putting the new TPO over it? A. That information was probably available to me. I did not -- it wasn't significant to me at the time. Q. Whether a core was taken was available to you at the time of the inspection but -- but insignificant . . .

building to look without having to disassemble anything—all steps that could have been done without dismantling anything.[29] GAF's corporate representative confirmed that GAF informs contractors that they need to take cores of underlying roofing materials and need to provide pull tests results.[30] And to achieve the status of being a certified applicator of GAF materials, GAF tells such contractors, including One Source, that it must follow local building codes. That includes pulling applicable work permits showing prior work done to the location and ensuring that there are no more than two roofs on the building at a time.[31] But Mr. Whitman checked none of those things.

Luling's roofing expert explained that an adequate inspection would have revealed, among other things, the serious flaws with the installation: the roof deck was

---

A. Yes."); ROA.2269, Whitman depo. ("Q. . . . [A] pull test, whoever was supposed to do it, whenever they were supposed to do it, that's a pretty important step? A. I would think so, yes. Q. Yeah. Because we don't want the roof . . . to blow off? A. Correct."); ROA.2279-2281, La Vine depo. (had pull test been performed and failed to achieve high enough pull-out, issue would have needed to be addressed).

[29] ROA.2314-2315, Schaack depo. (GAF's roofing expert) (acknowledging nondestructive, non-dismantling acts a roof contractor can do to find out existing conditions but opining that it was not GAF's responsibility to complete these tasks); *see also* ROA.2343-2344, Fischer depo. ("[T]hey [GAF] could've asked to show them the cores or photographs of the roof cores. . . . [T]hey could've asked for pull test results. They could've gone inside. Without – without doing any destructive tests, [Whitman] could've gone through the building to see what was underneath the alleged or the existing wood deck, knowing that a wood deck . . . is not a proper deck on a nursing home. And to see if there was something else underneath there."); *see also* ROA.2344-2345, 2349, Fischer depo.

[30] ROA.2288-2290, GAF depo. (Harris).

[31] ROA. 2288, GAF depo. (Harris).

not sufficient to receive fasteners; there were multiple layers of roofing already on the structure—a violation of local building codes; there were deteriorated or nonexistent wood nailers; there was deformed or displaced metal flashing off the edge; and an insufficiently attached substrate to which the roofing membrane was fastened.[32]

> **4.    Only a few months after installation, the poorly installed roof detaches from the nursing home.**

Hurricane Ida struck a few months after the installation of the new roof system.[34] The maximum sustained winds at the property were below Category 1 level.[35] The deficient installation caused the newly installed TPO membrane to lift at the perimeter, pulling off the roof decking.[36] One Source knows of no other One Source roof that failed during Hurricane Ida.[37]

The detached roof on the nursing home caused, among other things, structural damage, significant water intrusion, and the loss of most of the property's contents. This left Luling unable to operate its business for several years.

---

[32]    ROA.2335-2341, Fischer depo.

[34]    ROA.2240-2241, Luling depo. (Guillot).

[35]    ROA.2361-2363, excerpt of Mitchell expert report (maximum sustained winds at property location were 62 mph). GAF's weather expert disagreed slightly, believing the winds were, at most, Category 1 level. ROA.2375, Keim depo.

[36]    ROA.2236-2237, Luling depo. (Guillot); *see also* ROA.2364-2368, Fournet depo. (Luling's expert on mechanism of roof failure).

[37]    ROA.2249, One Source Roofing depo. (Wedding).

After the damage, GAF later rescinded its own "guarantee."[38]

## B.    Procedural History.

### 1.    Luling sues One Source and GAF for negligence in installing and inspecting the roof system. GAF argues that it has no duty, but the district court denies its motion to dismiss.

Luling sued GAF and One Source and related defendants for negligence in inspecting and installing the roof.[39] Luling alleged that GAF breached its duty to ensure the roof was installed in a good and workmanlike manner in conformity with applicable laws and building codes, GAF's guidelines, and good roofing practices.[40]

GAF moved to dismiss. The district court (at that time, Judge Milazzo) denied the motion, explaining:

> Plaintiff's Amended Complaint states that by sending its employees to the Property to "warn plaintiff of any defects in the installation," and "ensure the roof was installed in a good and workmanlike manner," GAF assumed a duty to Plaintiff, which it breached when it failed to note the deficient installation. . . . Drawing all reasonable inferences in Plaintiff's favor, it is plausible that GAF assumed a duty . . . .[41]

The case was later transferred to Judge Long upon his appointment to the bench.[42]

---

[38]    ROA.2297, GAF depo. (Harris) ("Q. What's the status of the guarantee now? A. I believe it has been rescinded.").

[39]    ROA.328-330, amended complaint, ¶¶ 24-31.

[40]    ROA.328, ¶¶ 24-25.

[41]    ROA.573, order denying GAF's motion to dismiss.

[42]    ROA.678, transfer order.

**2. GAF seeks summary judgment on duty and breach. The district court—crediting GAF's unilateral narrowing of the scope of its inspection—grants summary judgment.**

GAF moved for summary judgment, arguing that it owed no duty and, alternatively, breached no duty.[43] Luling opposed the motion. Its opposition explained that by conducting an inspection, GAF assumed a duty to perform the inspection in a reasonable and prudent manner and that it breached that duty in failing to note numerous deficiencies in One Source's installation of the roof.[44]

The district court granted GAF's motion for summary judgment.[45] In doing so, it accepted GAF's theory that GAF's motivation for its inspection of the roof was to conduct only a "surface" inspection for GAF's own purpose of determining whether it would issue a guarantee to Luling.[46] It held that GAF had not undertaken any duty to Luling to conduct a reasonable inspection.[47]

After crediting GAF's premise and allowing GAF to unilaterally narrow the scope of its duty, the district court found that even if GAF undertook a duty to conduct a surface inspection of the roof, GAF did not breach that duty.[48] According to

---

[43]    ROA.1788, GAF's motion for summary judgment.

[44]    ROA.2187, Luling's opposition to motion for summary judgment.

[45]    ROA.7496, order granting motion for summary judgment.

[46]    ROA.7516.

[47]    ROA.7526.

[48]    ROA.7525.

14

the district court, the alleged issues that led the roof to fail could not have been observed during a surface inspection.[49] Again, the district court allowed GAF to unilaterally define the scope of its inspection duty by accepting GAF's premise that it intended for the inspection to be a "surface inspection only." Yet even if the inspection were limited to a surface one, GAF offered no evidence of what the term "surface inspection" meant or what it could or could not entail. Luling's evidence showed that—surface level or not—there were numerous deficiencies with the installation that should have been caught had a reasonable inspection been performed.

Finally, conflating breach and causation, the district court assumed that GAF could not have compelled One Source to fix any deficiencies GAF might have identified with the roof anyway.[50]

> **3. Though the district court's original opinion overlooked key evidence and failed to credit all evidence in Luling's favor, it stands by its ruling and denies reconsideration.**

Luling filed a motion for reconsideration. In its motion, it pointed out that the district court did not address certain deposition testimony cited by Luling.[51] Specifically, the district court overlooked that GAF's corporate representative *agreed* (1) that its inspector should note non-compliance with GAF specifications,

---

[49]    ROA.7525.

[50]    ROA.7525.

[51]    ROA.7532, motion for reconsideration.

which include good roofing practices and compliance with building codes,[52] and (2) that it is reasonable for a property owner to rely on and have an expectation interest in GAF's inspection.[53] The district court opinion had likewise failed to address testimony from both Luling and GAF's experts confirming that there were non-destructive steps that could have been taken to identify the deficiencies with Luling's roof installation.[54]

The district court denied Luling's motion for reconsideration.[55] Luling reached a settlement with the other defendants, so only Luling's negligence claim against GAF remained. The district court entered a final judgment dismissing Luling's claim against GAF.[56]

## IV.    SUMMARY OF THE ARGUMENT

GAF conducted a negligent inspection of Luling's newly-installed roof over its nursing home facility, and the roof failed catastrophically. The district court incorrectly granted summary judgment by concluding that GAF owed no duty or else

---

[52]    ROA.2293, GAF depo (Harris).

[53]    ROA.2295, GAF depo (Harris).

[54]    ROA.2343-2345, Fisher depo.; ROA.2314-2315, Schaack depo. (recognizing nondestructive, non-dismantling things that can be done but claiming that it was not GAF's responsibility to complete these tasks).

[55]    ROA.7588, order denying motion for reconsideration.

[56]    ROA.7597, judgment.

breached no duty. In doing so, it wrongly allowed GAF to narrowly define the scope of its own duty.

According to GAF, it had the subjective motivation to conduct a narrow, surface-level inspection for its own benefit only. Yet in this diversity case based on Louisiana law, *Malta v. Herbert S. Hiller Corp.* from the Louisiana Supreme Court does not allow this result.[57] As *Malta* explains, a party's narrow characterization of its own duty does not control. The underlying facts and law supply the scope of the duty, not a party's own formulation, subjective motivation, or understanding. The district court's crediting of GAF's evidence and framing of the issue—a result not permitted on summary judgment—tainted its analysis on duty and breach.

According to One Source, it is to follow GAF's "guidelines." And GAF was to inspect and certify the One Source-installed roofing system, but it failed to note major deficiencies. It  was foreseeable that such deficient inspection could cause significant harm to Luling when its roofing system failed. The facts in this record showed that GAF owed a duty to conduct a reasonable inspection that ensured compliance with local building codes and good roofing practices, but GAF failed to do so.

Granting summary judgment in favor of GAF was incorrect. This Court should reverse.

---

[57]    2021-0209 (La. 10/10/21), 333 So. 3d 384.

## V.    LAW AND ARGUMENT

### A.    Review is *de novo* and all evidence must be viewed in Luling's favor in determining whether GAF had and breached its duty.

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[58] "Whether liability exists under a particular set of facts is determined using a duty/risk analysis."[59] A plaintiff must prove:

> (1) the defendant had a duty to conform his conduct to a specific standard; (2) the conduct failed to conform to the appropriate standard; (3) the substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the substandard conduct was a legal cause of the plaintiff's injuries; and (5) proof of actual damages.[60]

GAF's motion for summary judgment challenged duty and breach. According to GAF, Luling has no evidence that (1) GAF owed it any duty, and (2) GAF breached any duty. Of course, all facts must be viewed in the light most favorable to Luling, the non-movant, and all reasonable inferences must be drawn in Luling's favor.[61] And if a genuine issue as to any material fact exists, summary judgment must be denied. A dispute is "genuine" such that summary judgment must be denied

---

[58]    La. Civ. Code art. 2315.

[59]    *Malta v. Herbert S. Hiller Corp.*, 2021-0209 (La. 10/10/21), 333 So. 3d 384, 395.

[60]    *Id.*

[61]    *Parker v. Barriere Constr. Co.*, No. 23-2010, 2024 WL 3677167, at *1 (E.D. La. Aug. 5, 2024).

when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[62] The standard of review on summary judgment is *de novo*.[63]

> **B.    By inspecting the roof to determine whether it met GAF specifications and good roofing practices, GAF assumed a duty to perform an inspection in a reasonable and prudent manner.**

The threshold issue in any negligence claim is whether a defendant owed a plaintiff a duty.[64] "A duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."[65] In determining whether a duty exists, the inquiry is whether the plaintiff has "any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty."[66] Notably, "whether a duty is owed is made on a case-by-case basis."[67] And "[a]lthough duty is a question of law, Louisiana courts do not grant summary judgment on the issue of duty where factual disputes exist or where credibility determinations are required."[68] Indeed, where "the Court cannot determine an issue of law without determining the credibility of witnesses or

---

[62]    *Id.*

[63]    *Favela v. Collier*, 91 F.4th 1210, 1212 (5th Cir. 2024).

[64]    *Malta*, 333 So. 3d at 395.

[65]    *Id.* (internal quotation marks omitted).

[66]    *Id.*

[67]    *Id.* at 396.

[68]    *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0366, 2015 WL 6758258, at *20 (E.D. La. Nov. 5, 2015).

deciding a disputed issue of material fact, summary judgment on the question of [duty] is precluded."[69]

### 1. A person who undertakes a task—even one that he otherwise has no obligation to perform—must perform that task in a reasonable and prudent manner.

GAF asserted that it owed no duty to Luling. According to GAF, it had no contractual obligation or "special relationship" with Luling to ensure that the roof was installed in a good and workmanlike manner or to identify defects in the installation. GAF and Luling may have had no direct contractual relationship with each other. But by undertaking the inspection, GAF *assumed a duty to inspect the roof in a reasonable and prudent manner.*

When GAF previously moved to dismiss, then-presiding Judge Milazzo held: "There is an almost universal duty on the part of the defendant in a negligence action to use reasonable care to avoid injury to another."[70] Accordingly, when a person who otherwise has no duty to perform a task chooses to undertake that task, "he must perform that task in a reasonable and prudent manner. Negligent breach of a duty

---

[69]     *Id.*; *see also Teaver v. Seatrax of La., Inc.*, No. 10-1523, 2013 WL 1288614, at *5 (E.D. La. Mar. 27, 2013) (finding that summary judgment on the issue of duty was precluded because there were factual questions as to whether the defendant had assumed a duty to the plaintiff); *Morvant v. Oil States Int'l, Inc.*, 3 F. Supp. 3d 561, 565 (E.D. La. 2014) ("Although the existence of a duty is a question of law for the Court, the factual predicates for the imposition of that duty are a question for the fact finder.").

[70]     ROA.573, order denying GAF's motion to dismiss.

which has been voluntarily or gratuitously assumed may create civil liability."[71]

*Cenac v. Orkin, L.L.C.* is instructive on this point. After an Orkin representative completed a termite inspection, he noted excessive moisture that could be conducive to termites.[72] He recommended that plaintiffs install a vapor barrier under the house to prevent infestation. He then approved that installation as "adequate."[73] When the home was later infested, the plaintiffs sued Orkin for negligence, alleging that the poorly installed barrier was a major factor in causing the infestation.

This Court recognized Orkin's contracts with the plaintiffs encompassed no obligation to recommend, instruct, or direct the plaintiffs on how to remedy conditions conducive to infestation. Instead, "Orkin undertook the task of recommending and directing installation of a vapor barrier, which . . . it had no obligation to do under its contracts."[74] Once Orkin undertook that task, it was required "under Louisiana law to perform that task in a reasonable and prudent manner."[75]

*Crane v. Exxon Corp., USA* provides another example of this concept. The

---

[71]    *Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 188, 195 (5th Cir. 2019).

[72]    *Id.* at 188.

[73]    *Id.*

[74]    *Id.* at 196.

[75]    *Id.* (internal quotation marks omitted).

plaintiff, employed by Merit, was injured while working at an Exxon plant.[76] The court noted that Exxon had no contractual duty to provide a safe place for Merit's employees to work. "However, [Exxon] maintained the right to inspect the job at any time to monitor compliance with its specifications."[77] Exxon had a field contract coordinator to ensure that Merit followed Exxon's "specifications."[78] Exxon's employee "voluntarily assumed the task of monitoring the jobsite for violations of Exxon safety standards by Merit. . . . Having assumed this responsibility, [the Exxon employee] had a duty to perform it in a reasonable and prudent manner."[79] He had failed to do so; Exxon was thus liable for its employee's negligent breach of an assumed duty.[80]

*Cenac* and *Crane* are no outliers. When one undertakes a task, he has a duty under Louisiana law to perform that task in a reasonable and prudent manner:

- *Teter v. Apollo Marine Specialties, Inc.*, 2012-1525 (La. App. 4 Cir. 4/10/13), 115 So. 3d 590, 598-99 ("Apollo Marine's driver . . . took an active role in the process of unloading the truck. . . . Mr. Teter. . . testified that the driver negligently pushed the spool too hard causing it to roll off the truck. . . . Assuming

---

[76]   613 So. 2d 214, 217 (La. App. 1 Cir. 1992), *judgment amended*, 633 So. 2d 636 (La. App. 1 Cir. 1993).

[77]   *Id.* at 221.

[78]   *Id.*

[79]   *Id.*

[80]   *Id.* ("In failing to notice the absence of a temporary covering over the chute, a clear violation of Exxon safety standard 162, he breached his duty toward Crane to exercise reasonable care in inspecting the jobsite for safety violations. Thus, Exxon is liable for its employee's negligent breach of an assumed duty which resulted in Crane's injury.").

22

Mr. Teter's testimony to be true for purposes of this motion for summary judgment, we find that Apollo Marine assumed a duty to exercise due care in unloading the rope.");

- *Dartlone v. La. Power & Light Co.*, 33,597 (La. App. 2 Cir. 6/21/00), 763 So. 2d 779, 785-86 ("[F]our City employees were aware of the downed line. First, Mr. Rowell assumed responsibility for the situation when he inspected the line, was unsure of its origin and directed two electricians . . . to inspect the line and report their findings. Next, Mr. Battaglia . . . assumed responsibility for the situation when he radioed Mr. Wright and informed him that he and Mr. Sloan would remain with the line until LP & L arrived. . . . We find, therefore, that the City, through these employees, was aware of the dangerous situation and gratuitously or voluntarily assumed the responsibility of investigating and protecting the public until the situation could be reported and repaired.");

- *Moore v. Pride Offshore, Inc.*, No. 98-0569, 1999 WL 705548, at *2 (E.D. La. Sept. 9, 1999) ("At first blush, it appears beyond argument that Bauman did not have a duty to advise Moore to 'watch your step when walking in the dark.' However, under the particular circumstances of this case, Bauman being much more familiar with traversing the production deck of the platform and aware of the fact that frequently, materials and equipment are stored in the dimly lighted area, by allowing Moore to accompany him, Bauman may have assumed a duty to warn Moore of the risks which he might encounter in the areas that plaintiff had never before traversed.").

> **2.  By undertaking an inspection of the roof installation, GAF assumed a duty to inspect the roof in a reasonable and prudent manner.**

GAF's employee inspected One Source's installation. By doing so, Louisiana law imposed a duty to inspect in a reasonable and prudent manner. And, as GAF's corporate representative confirmed:

- The inspection was to ensure the roof installation complied with GAF's specifications, and GAF's specifications include compliance with local

23

building codes and good roofing practices;

- An inspector shall note and bring to the attention of the contractor any noncompliance with those specifications for correction; and

- The resulting issuance of a GAF guarantee is confirmation that the GAF inspection has determined that the roofing work complied with GAF specifications. [81]

Yet GAF convinced the district court that it intended to perform a "surface inspection" and that its inspection was solely to determine warranty eligibility for its own benefit.[82] That formulation is incorrect for at least three reasons.

      **a.**   *Malta* **applies in this diversity case, and it confirms that a party—like GAF—does not get to narrowly define the scope of its inspection duty.**

First, the Louisiana Supreme Court recently confirmed that a party does not have the right to define or narrow the scope of its own duty, as GAF tries to do here.

---

[81]    ROA.2293, GAF depo. (Harris) (discussing GAF Roofing System Overview & General Requirements Manual: "[I]t says: 'Should a GAF field services representative observe conditions on the job site [that] do not conform with the requirements of this manual or standard good roofing practices such conditions will be brought to the attention of the roofing contractor.' . . . Shouldn't we expect the field services representative to note noncompliance with the manual or specifications, isn't that . . . an expectation? A. It is an expectation."); ROA.2291 ("Q. [T]hat's appropriate, right, that a guarantee should not be issued if the work doesn't comply either with the manual or the specification? A. Yes."); ROA.2291-2292 ("Q. [That a guarantee was issued] tells us at least that GAF believed that the work was in compliance with the manual or the specifications? A. They met the acceptable minimum standard, yes. Q. . . . the acceptable minimum standards contained in the manual or the specification? A. Yes.").

[82]    ROA.7513-7514, order granting motion for summary judgment.

24

In *Malta v. Herbert S. Hiller Corp.*, the company "hired to inspect [an offshore] platform's fire suppression systems" owed "a duty of care" to a plaintiff who was injured when transporting a component of the fire suppression system.[83] The plaintiff (Malta), worked on an offshore platform owned by Helis Oil and Gas Company. Helis hired Hiller Corporation to perform safety inspections. The stated purpose of the inspection was narrow: "to determine whether the suppression equipment could extinguish fires or was in need of service."[84] The inspector observed that the pressure gauge on a fire-suppression cylinder was zero. He put a red tag to indicate a need for servicing.[85] He failed, however, to note that the cylinder may still be pressurized despite the pressure gauge reading.[86]

The plaintiff was transporting the cylinder for repair. In doing so, the cylinder—still pressurized—began to hiss and spin, struck the plaintiff, and threw him into the air.[87] The trial court found that the inspector—who failed to note that the cylinder may still be pressurized—breached a duty to the plaintiff and assessed fault.[88]

---

[83]    2021-00209 (La. 10/10/21), 333 So. 3d 384, 389.

[84]    *Id.* at 390.

[85]    *Id.* at 390-91.

[86]    *Id.* at 393.

[87]    *Id.* at 392.

[88]    *Id.* at 393.

The Louisiana Supreme Court granted writs to consider whether "an inspection company not contracted to perform inspections implicating personal safety have a duty to a subsequently-injured third party."[89] The inspector framed its role as a limited one: "to determine whether Helis's fire suppression systems could put out fires and, if not, to tag the equipment for servicing."[90] The Court rejected that limited framing of its role and did not permit a party to narrowly define the scope of its own inspection and resulting duty. "[C]ourts have not adopted such a bright-line test for determining to whom a duty is owed in connection with the inspection services provided. Notably, the inquiry into whether a duty is owed is made on a case-by-case basis."[91]

Hiller had "not been engaged to provide maintenance services" and was "obligated to inspect Helis's fire suppression equipment to determine whether it could extinguish fires or was in need of service."[92] But the scope of the duty was *not* just to "simply inspect the fire suppression equipment and tag the equipment identified as needing to be serviced."[93] There was a duty to note "the inspector's findings and

---

[89]     *Id.* at 394-95.

[90]     *Id.* at 395.

[91]     *Id.* at 396.

[92]     *Id.*

[93]     *Id.*

identif[y] detected deficiencies."[94] And that duty to identify deficiencies would be "meaningless" if Helis and the platform owner "could not rely on Hiller's expertise to competently conduct the inspection and accurately report the results."[95] So, despite the lack of any direct relationship vis-à-vis the plaintiff and the inspector and despite any agreement in advance that the inspection should also note the possibility of maintenance needed to equipment, the injured plaintiff was within the scope of the duty to prudently inspect and identify deficiencies.[96]

In this diversity case, *Malta* presents governing Louisiana law on the formulation of an inspection duty. And it counsels that a party does not get to subjectively frame its own duty. The district court, however, latched on to immaterial factual distinctions from *Malta* and missed this key point.[97]

---

[94]    *Id.*

[95]    *Id.*

[96]    *Id.* ("[T]he trial court did not legally err in finding that Hiller owed a duty to Plaintiff.").

[97]    ROA.7521, order granting motion for summary judgment ("(1) [U]nlike the inspection company in *Malta*, GAF is not a professional inspector and was not hired for the purpose of inspecting the roof; (2) unlike the inspection company in *Malta*, which was required to report its findings to the owner of the platform, GAF did not have any contractual obligation to report its post-installation surface inspection findings to Luling; GAF in fact had no contractual obligation with Luling until the Guarantee issued; and (3) unlike the inspection in *Malta*, which was intended 'to protect the rig and the employees working thereon in the event of a fire,' GAF's inspection was a surface (*i.e.*, visual) inspection undertaken for GAF's sole benefit.").

The district court's opinion also focused on Louisiana's application of Section 324A of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Louisiana Supreme Court has looked to this Restatement provision for decades, including in *Bujol v. Entergy Services, Inc.* in 2004, long before the Court's decision in *Malta*.[98] So, *Malta*, by definition, implicitly found that the analysis of the Restatement criteria were satisfied when it held that the defendant did not get to define the scope of its own inspection duty and found a duty owed to the plaintiff there.[99]

As in *Malta*, GAF's duty was not as narrow as it claims. GAF's stated intention for the inspection—just like Hiller's stated intention for its inspection—may

---

[98] 2003-0492 (La. 5/25/04), 922 So. 2d 1113, 1128.

[99] And those Restatement criteria, to the extent they apply, are likewise satisfied here because, as discussed below, Luling relied on GAF's inspection and suffered harm as a result.

28

have been of a limited scope and for a limited purpose. But a defendant's stated intention does not control: what matters is whether a party is foreseeably injured as a result of an unreasonable inspection.[100] That is what happened in *Malta* and what happened here. The district court erred in diverging from the Louisiana Supreme Court's latest analysis of the inspection-duty issue that applies with equal force here.

> **b.** **Yet even if GAF could define the scope of its own duty, it acknowledged its obligation to inspect for compliance with good roofing practices and local building codes.**

As *Malta* explains, GAF does not get to define the scope of its own duty. Yet even if that were not the case, even GAF acknowledges its obligation to ensure that the roof installation complied with GAF specifications—which include local building codes and good roofing practices.[101]

As GAF recognized, its Roofing System Overview & General Requirements Manual *requires* an inspector to bring any conditions that do not conform with the requirements of the manual or *standard good roofing practices* to the attention of the roofing contractor (here, One Source):

---

[100]   Perhaps the result would be different *if* an inspector disclosed and received sign-off of all parties in advance that it would only be conducting a narrow type of inspection for a narrow purpose and would not bear responsibility for harms that may arise from a deficient and underinclusive inspection. That did not happen in *Malta* and did not happen here.

[101]   ROA.2286-2287, 2293 GAF depo. (Harris); ROA.2370-2371, Collet depo. (GAF inspector Mr. Whitman told Collet that the roofing system performed to GAF standards).

29

Q. . . . If you look to the right under "inspections," it says: "Should a GAF field services representative observe conditions on the job site but do not conform with the requirements of this manual or standard good roofing practices such conditions will be brought to the attention of the roofing contractor." You see that?

A. I do.

Q. . . . Shouldn't we expect the field services representative to note noncompliance with the manual or specifications, isn't that . . . an expectation?

A. It is an expectation. The phrasing here, '[s]hould GAF' is in the event that we find something. Should we.

Q. The representative ought to be trained enough to note non-compliance, right?

A. Yes.[102]

That is consistent with Mr. Whitman's testimony that he had a "mental checklist" about what he was supposed to be looking for in an inspection. That mental checklist included GAF manual materials and specifications.[103] And Mr. Whit-

---

[102]   ROA.2293, GAF depo. (Harris).

[103]   ROA.2259, GAF depo. (Whitman) ("Q. When you inspected the roof at the Luling Living Center you had at least a mental checklist in your mind about what you were looking for, right? A. Yes. . . . Q. And that checklist can come from some GAF manuals, right, like maybe a specification? A. Yes."); ROA.2260-2261, GAF depo. (Whitman) ("Q. Are you at all familiar with GAF Everguard TPO Application and Specifications? A. Yes. Q. . . . They -- are they in your mental databank? A. To an extent, sure. Q. Okay. Do those specifications form part of the mental checklist you had when you --- when you went to the Luling Living Center? A. I would say yes.").

man told Kevin Collet—the loss adjuster for One Source's insurer—that he had inspected the roofing system and found it was in accordance with GAF standards.[104] In other words, Mr. Whitman supposedly confirmed that the roofing system complied with local building codes and good roofing practices.

Mr. La Vine—the One Source employee tasked with overseeing the roof installation—also confirmed that (1) One Source is to follow GAF's "guidelines" for the installation,[105] and (2) GAF's "role" in the installation was to identify issues and instruct One Source to fix them.[106] And GAF's expert agreed that the protocol involved GAF identifying deficiencies and tasking the contractor with correcting them.[107] Mr. Whitman's testimony is similar. If he noted a problem in his inspection, he was to instruct One Source to fix it and then follow up with GAF, "[k]ind of like

---

[104]   ROA.2370-2371, Collet depo. ("Q. Who told you [that Bobby Whitman inspected the roofing system and advised that the installation was performed to GAF standards]? A. Bobby Whitman. Q. He personally told you that he inspected the roofing system and that it was performed to GAF standards? A. That's correct."); *see also* ROA.2248, One Source Roofing depo. (Wedding) ("My understanding the roof was installed to specifications.").

[105]   ROA.2272, La Vine depo. ("We [One Source] follow their [GAF] guidelines."); *see* ROA.2245, One Source Roofing depo. (La Vine is the person "most knowledgeable about" the relationship with GAF).

[106]   ROA. 2283, La Vine depo. ("Q. And right in the middle of [Exhibit H, Field Services Report], contractor action required, GAF's role in this exercise was to spot the punch list item and to tell One Source to fix it; true? A. Correct."); ROA.2274, 2277-2278, La Vine depo.

[107]   ROA.2316, Schaack depo. ("Q. [GAF] identifies deficiencies to the contractor; it asks the contractor to correct them; and then according to the protocol, it follows up by asking for photographs of that correction; true? A. True.").

[his] supervisor does with [him]."[108] He created a "punch list" with the only issue his (insufficient) inspection identified: a hollow spot on the roof. Indeed, where Mr. Whitman noted that deficiency, One Source followed the expected process and corrected what was brought to its attention following the inspection.[109] But all instances of failure to comply with local building codes and good roofing practices that Mr. Whitman's inspection *failed* to note and *failed* to call to One Source's attention went uncorrected and uncommunicated to One Source to correct for Luling's benefit.[110]

As the district court's earlier ruling recognized when denying GAF's motion to dismiss, "GAF assumed a duty to Plaintiff, which it breached when it failed to

---

[108]    ROA.2264, GAF depo. (Whitman) ("Q. – you were telling the contractor in [Exhibit H, Field Services Report] go check it out. A. Right. Q. If it's a problem, fix it. If it's not a problem, move on. A. Exactly. Q. Follow up with me. A. Follow up with GAF, yes. Q. Kind of like your supervisor does with you. A. . . . I guess so.").

[109]    ROA.2282, La Vine depo. ("Q. . . . GAF did have a role, it spotted the problem and it told One Source to fix it and that day One Source fixed it; is that not true? . . . A. Yes. . . .").

[110]    The district court concluded that GAF "could not have compelled One Source Roofing to correct the alleged errors that led the roof to fail." ROA.7514, order granting motion for summary judgment. But had GAF pointed out One Source's errors and One Source ignored them, GAF would have complied with and not breached any duty and full blame for those failures to correct would have been on One Source. Likewise, had GAF pointed out the deficiencies but they went uncorrected, GAF would not have been a cause of Luling's damages: One Source would be. But that's not what happened. All record evidence showed that everything GAF *did* point out (a hollow spot on the roof) was immediately addressed by One Source. ROA.2282, La Vine depo. GAF failed to note and call to One Source's attention for correction many obvious deficiencies in its installation, so GAF breached its duty and bears comparative fault in causing Luling's injury.

note the deficient installation."[111] That formulation remains true, and construing all facts in Luling's favor, necessitates the finding that GAF owed a duty to perform a reasonable and prudent inspection here.

        c.        **GAF's duty to inspect the roof in a reasonable and prudent manner encompasses the risk that a deficient inspection will harm the property owner.**

Finally, though the argument runs contrary to *Malta*, GAF argues that it owed no duty to Luling because the inspection was ostensibly for GAF's own benefit. Again, GAF may not define the scope of its own duty. Its duty extends to those that may foreseeably be harmed by its negligence, like the property owner harmed by a deficient inspection of the roof resting over its nursing home.

GAF and the district court mistakenly believed that Luling needed to *know* that GAF specifically performed the inspection for the scope of GAF's duty to extend to it.[112] Louisiana law requires no such thing. The duty extends to those that could foreseeably be harmed by an unreasonable inspection, whether the identities of the plaintiff and defendant are known to each other or not. The Louisiana Supreme Court confirmed this point in *Barrie v. V.P. Exterminators, Inc.*, though the district court overlooked it. *Barrie* concerned whether a duty was owed by a termite

---

[111]    ROA.573, order denying GAF's motion to dismiss.

[112]    ROA.7519, order granting motion for summary judgment; ROA.1802, GAF's memorandum in support.

inspector (V.P.) to unknown, prospective buyers (the Barries) of a property.[114] And yet, though the termite inspector had no contract with the Barries as the prospective buyers of the property and *did not even know who they were*, the "scope of the duty" owed to the Barries "was to use reasonable care and competence in obtaining or ascertaining facts for and/or in communicating the facts or opinion in the wood destroying insect report."[115] The duty was owed "*even though* [the Barries] were a third party to V.P., without privity of contract or direct or indirect contact, because they were known to V.P. as the intended users of the report."[116] The duty extended to "members of the limited group for whose benefit and guidance the report was contracted and supplied."[117] According to the Louisiana Supreme Court, a "tortfeasor's knowledge of the prospective use of the information . . . expands the bounds of his duty of reasonable care to encompass the intended user."[118]

That is precisely the case here. GAF knew that Luling was an intended beneficiary of its inspection. Though Luling may not have known GAF's precise identity

---

[114]   625 So. 2d 1007, 1017–18 (La. 1993).

[115]   *Id.* at 1016.

[116]   *Id.*

[117]   *Id.*

[118]   *Id.*

and may not have had a contract with GAF, Luling was to benefit from GAF's certi-fication and inspection of the room system, or, alternatively GAF's identification of non-compliance so the roof installer could correct such non-compliance. It is irrelevant whether Luling knew GAF's specific identity in advance. Luling was a foreseeable beneficiary of a proper GAF inspection.[119] When its roof ultimately came off and destroyed its property, Luling was entitled to recover from all parties that comparatively played a role.

And beyond that, Luling's roofing contract informed Luling that the manufacturer would "inspect and certify the new roof system."[120] So, while perhaps GAF

---

[119]    *See, e.g., Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1385 (La. 1990) ("There is a high degree of reliance by one who contracts with another to build a building intended to last for many years. Given this degree of reliance, the superior knowledge of the builder and his access to information concerning industry improvements and advances, it is only logical that the builder who acquires knowledge that can prevent personal injury or property loss has a duty to convey that information to those for whom he has built. The failure to disclose information which is not available to discovery by the ordinarily prudent and reasonably diligent owner, and which if known can help the owner prevent serious property damage or personal injury, violates the duty to behave reasonably."); *Alley v. Courtney*, 448 So. 2d 858, 860 (La. App. 2 Cir. 1984) ("As a professional appraiser and inspector, defendant knew or should have known that each of his reports would be relied on to the detriment of a lender if the report was erroneous. Under such circumstances, defendant's duty was not owed solely to the builder, but extended to plaintiff and others that might suffer reasonably foreseeable and direct injury because of a breach of the duty owed by defendant."); *Westover Prods., Inc. v. Gateway Roofing Co.*, 380 S.E.2d 369, 372 (N.C. Ct. App. 1989) ("Carlisle [the manufacturer of the roof system, which duties, the plaintiff claimed 'encompass the mechanics of fastening the membrane to the building as well as the layout and installation methods in application)'] owed a duty to [the property owner] Kidde because a reasonable person would have understood that if Carlisle did not use reasonable care in its conduct, it would cause injury to Kidde.").

[120]    ROA.2251-2253, contract between One Source and Luling.

has a claim against One Source if GAF does not agree with that representation being made by GAF's "certified applicator," One Source, the contract communicated to Luling that it had every right to expect that its new roof would be inspected and certified by a third party.[121]

GAF even confirmed with binding corporate testimony that a property owner should reasonably have an expectation that GAF's inspection will note any non-compliance with a roofing system that it has inspected:

> Q.    Okay. Do you agree with me that an owner ought to be able to expect the GAF rep who's looking at the roof system to note things that are not in compliance with GAF recommendations?
>
> A.    Yes. There could be a level of expectation.
>
> Q.    Okay. And there should be?
>
> A.    Yes.
>                              . . .
> Q.    . . . It's fair, isn't it, for the owner to have that expectation?
>
> A.    The assumption of expectation, *yes, it would be*.[122]

GAF was not the entity to perform the physical labor. But it took on the role to "identif[y] deficiencies to the contractor" and "ask[ ] the contractor to correct

---

[121]    ROA.2255, declaration of Michael Guillera, ¶ 6.

[122]    ROA.2295-2296, GAF depo. (Harris) (emphasis added).

36

them."[123] Put another way, its task was a supervisory one: GAF was to inspect the installation, note problems, and have One Source correct them.[124] A failure to note deficiencies, and, consequently, to correct them, was to Luling's detriment. As GAF's expert acknowledged, it is important to ensure that a roof stays on "[s]o that the building can maintain its operations" and protect people that might be inside.[125]

Luling was aware that an inspection was to be performed and had the expectation that it would be performed in a competent way with any resulting deficiencies addressed.[126] Accordingly, Luling suffered harm because of its reliance on GAF's undertaking, satisfying Section 324A of the Restatement to the extent the Restatement applies here.[127] Indeed, why would Luling undertake any further steps to in-

---

[123]   ROA.2316, Schaack depo. ("Q. GAF, in terms of industry custom, never ever has a duty to mechanically grab tools and perform remedial work on a roof after it has identified deficiencies, right? A. Correct. Q. It identifies deficiencies to the contractor; it asks the contractor to correct them; and then according to protocol, it follows up by asking for photographs of that correction; true? A. True.").

[124]   ROA.2264, GAF depo. (Whitman) ("Q. -- you were telling the contractor in [Exhibit H, Field Services Report], go check it out. A. Right. Q. If it's a problem fix it. If it's not a problem, move on. A. Exactly. Q. Follow up with me. A. Follow up with GAF, yes. Q. Kind of like your supervisor does with you? A. . . . I would -- I guess so.").

[125]   ROA.2305, Schaack depo.

[126]   ROA.2254-2255, Guillera declaration, ¶ 6; ROA.2234-2235, Luling depo. (Guillot) (Luling understood that "[s]omebody was supposed to go inspect" the roof); ROA.1893, contract between One Source and Luling ("[T]he manufacturer's representative will inspect and certify the new roof system.").

[127]   Restatement (Second) of Torts § 324A (1965) ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the

37

spect or confirm the installation of its roof when it had the expectation that an inspection and certification by the manufacturer had accompanied the installation?

The district court accepted GAF's claim that its subjective motivation was to perform a narrow inspection for GAF's benefit only. But that unfairly gave every inference to *GAF*—instead of to *Luling*. In undertaking an inspection, there is a duty to perform the inspection in a reasonably prudent manner to avoid foreseeable injury that could result from a deficient inspection. GAF did not communicate or get Luling's buy-in to narrow the scope of its inspection and resulting duty. Luling was a foreseeable victim that could foreseeably be harmed—and was harmed—by GAF's deficient inspection. The district court erred in allowing GAF to unilaterally frame the issue as an inspection that was supposedly only for GAF's own benefit. Luling was, at a minimum, the intended beneficiary of any warranty that GAF may issue. Any suggestion that Luling was not a foreseeable beneficiary of the inspection or a foreseeable victim of an insufficient inspection fails.

---

protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if . . . the harm is suffered because of reliance of the other or the third person upon the undertaking.").

**3.    The district court wrongly disregarded *Olympic Products*—the closest parallel to these facts—and gave undue weight to *Duplantis v. Miller*.**

**a.    *Olympic Products* persuasively recognized a duty owed to the property owner by a roofing manufacturer who conducted a deficient inspection.**

*Olympic Products Co. v. Roof Systems, Inc.*, from the North Carolina Court of Appeals, parallels this case in many ways. The property owner Olympic (like Luling) and Roof Systems (like One Source) entered a contract where "Roof Systems agreed to install the roof membrane in such a manner that the manufacturer of the membrane, defendant Carlisle [like GAF], would issue its standard warranty."[128] There, like here, the manufacturer inspected the roof installation. And there, like here, the inspector identified a deficiency requiring follow-up but did not note additional deficiencies where the installation failed to comply with the manufacturer's specifications and good practices.[129] The plaintiff, there, like Luling here, had a roofing expert opine that the approval of the installation "did not meet the standard of care for roofing inspectors."[130]

---

[128]    *Olympic Prods. Co. v. Roof Sys., Inc.*, 363 S.E.2d 367, 369-70 (N.C. Ct. App. 1988).

[129]    *Id.* at 370.

[130]    *Id.* at 371.

That case confronted "[whether] the manufacturer of the roof membrane, owed a duty to Olympic, the building owner, to properly inspect the roof application."[131] The plaintiff there, like here, sought "recovery against Carlisle for failing to exercise reasonable care in inspecting the installation of the membrane. It argues Carlisle owed it a duty to inspect and that there was sufficient evidence, when considered in the light most favorable to it, to show that Carlisle breached that duty."[132] And there, again just like here, there was no contract vis-à-vis the property owner and the manufacturer that inspected the roof.

On these similar facts, *Olympic Products* acknowledged that the plaintiff-property owner "need not prove privity of contract with Carlisle in order to prove that Carlisle owed it a duty" because "one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking."[133]

With Carlisle's inspection to determine whether the roof was installed to the manufacturer's "specifications," Carlisle "rendered services to Roof Systems [the

---

[131]    *Id.*

[132]    *Id.*

[133]    *Id.* at 371-72 (quoting *Quail Hollow E. Condo. Ass'n v. Donald J. Scholz Co.,* 268 S.E.2d 12, 15 (N.C. Ct. App. 1980)).

40

installer] which it should have recognized were necessary for Olympic's [the property owner's] protection."[134] Consequently, despite a lack of contract between the roof manufacturer and the property owner, "Carlisle knew or should have known . . . that compliance with its specifications was necessary for Olympic's protection."[135]

Though the parallels between *Olympic Products* and this case are uncanny, GAF and the district court dismissed it as having little to offer because it comes from North Carolina. But that is a distinction without a meaningful difference. Louisiana law requires that one who undertakes a task "must perform that task in a reasonable and prudent manner."[136] The *Olympic Products* court's reasoning was based on the identical premise that, under North Carolina law, a person who undertakes a task it should recognize as needed for the protection of a third party "is subject to liability to the third person for injuries resulting from his failure to exercise reasonable care in such undertaking."[137]

---

[134]   *Id.* at 372 ("The inspector for Carlisle testified as follows: Q. But you were sent [to the plant] on behalf of Carlisle to determine whether there had been a proper installation; were you not? A. I was sent there to check to see that the roof was installed to our specifications. Q. Okay. And that's what you mean by 'a proper installation'? A. Meeting our specifications? Yes.").

[135]   *Id.*

[136]   *Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 188 (5th Cir. 2019).

[137]   *Olympic Prods. Co.*, 363 S.E.2d at 372.

The district court's contention that *Olympic Products* does not apply because it does not expressly analyze duty under Section 324A of the Restatement also misses the mark.[138] While *Olympic Products* does not cite the Restatement directly, its very formulation defining duty quotes language from the Restatement as quoted in *Quail Hollow East Condominium Ass'n v. Donald J. Scholz Co.,* which itself cites the Restatement.[139] North Carolina courts approach duty in the same way that Louisiana courts do. The *Olympic Products* court persuasively found that an inspection duty was owed by a roofing manufacturer to a property owner even though no relationship between the parties otherwise existed. The same result should follow here.

> **b.** **The district court's reliance on *Duplantis v. Miller*— where the roofing manufacturer played no role in any inspection—was misplaced.**

Rather than follow the persuasive and on-point analysis of *Olympic Products*, the district court put more weight on *Duplantis v. Miller* from the Louisiana Third Circuit.[140] But invoking *Duplantis* ignores the obvious distinctions between the role of the roofing manufacturer there (none) and the role of GAF here (to perform a reasonably prudent inspection in accordance with GAF's own specifications that encompass good roofing practices and compliance with local building codes).

---

[138]   ROA.7523, order granting motion for summary judgment.

[139]   268 S.E.2d 12, 15 (1980), cited in *Olympic Prods. Co.*, 363. S.E.2d at 372.

[140]   2014-1070 (La. App. 3 Cir. 3/4/15), 159 So. 3d 1153.

*Duplantis* affirmed a grant of summary judgment in favor of a roofing manufacturer where the claims against the manufacturer were based only on (1) a statement on the manufacturer's website that it would "provide assistance with the installation of [the plaintiffs'] metal roof" and (2) the manufacturer came to measure the amount of material needed before the roof was installed.[141] The manufacturer never again visited the site, no assistance with the installation was sought, and it did not conduct an inspection so did not assume a duty associated with an inspection as GAF did here.[142]

There is a marked difference between the ministerial act of measuring material pre-installation, as the *Duplantis* manufacturer did, and reviewing the sufficiency of an installation to ensure it complies with GAF specifications—including good roofing practices—and directing the installer to remedy any deviations. Accordingly, the district court's conclusion that *Duplantis* "disfavors imposing an all-purpose installation inspection duty on GAF" is misplaced and shows that the district court perceived this as an all-or-nothing exercise for imposing a duty on roofing manufacturers.[143] But it is perfectly logical and appropriate that the roofing manufacturer would owe no duty based on its role in *Duplantis* whereas GAF *does*

---

[141]   *Id.* at 1155.

[142]   *Id.* at 1157.

[143]   ROA.7517, order granting motion for summary judgment.

owe a duty here given it performed an inspection of the installation that failed to comply with its own specifications and instructions that it gives to contractors. The underlying facts matter. And here, the facts more closely mirror *Olympic Products* that recognized a duty owed to the property owner by the roofing manufacturer that conducted a deficient inspection. Again, "whether a duty is owed is made on a case-by-case basis."[144]

GAF assumed a duty to Luling to inspect the roof in a reasonable and prudent manner. GAF's no-duty argument fails.

**C.    GAF breached its duty to inspect the roof in a reasonable and prudent manner. The district court erred in finding no breach because GAF unilaterally claimed it would perform a "surface inspection."**

**1.    The district court found no breach because it erroneously credited GAF's evidence that it would conduct a "surface inspection" only.**

GAF contends that, if it did owe a duty (and it did), there was no breach because GAF intended to perform a "surface inspection" only. The district court credited that unilateral narrowing by GAF when finding no duty, and likewise, incorrectly credited that formulation again to find no breach. But on summary judgment, every inference must be construed in Luling's favor. Construing the scope of the inspection in *GAF's favor* based on GAF's unilateral intent, unilateral

---

[144]    *Malta v. Herbert S. Hiller Corp.*, 2021-0209 (La. 10/10/21), 333 So. 3d 384, 396.

guarantee never agreed to by Luling (or even sent to Luling until months after the damage), and with no evidence as to what a so-called "surface inspection" entails was a mistake. The evidence in Luling's favor shows that GAF was to "inspect and certify" the roof installation without limitation.[145] Again, under *Malta*, GAF does not get to limit the scope of the inspection based on its own subjective (and uncommunicated) motivation.[146]

Because it wrongly allowed GAF to define the scope of the inspection, the district court reached the erroneous conclusion that GAF's surface-only inspection was not unreasonably performed.

> **2.    Whether GAF's inspection was reasonable is a disputed fact question. Roofing experts confirmed numerous ways in which GAF's inspection fell short.**

"[W]hether a defendant has breached a duty owed is a question of fact."[147] As such, it is for the jury to decide.[148] The district court erred in granting summary judgment in GAF's favor and taking the question of whether GAF failed to exercise

---

[145]    ROA.2252, roof installation contract (indicating the "the manufacturer's representative will inspect and certify the new roof system").

[146]    333 So. 3d at 395 (declining to adopt bright line rule in determination of duty based on an inspecting party's stated purpose of the inspection).

[147]    *Broussard v. State ex rel. Off. of State Bldgs.*, 2012-1238 (La. 4/5/13), 113 So. 3d 175, 185.

[148]    *Id.*; *Robertson v. Blanchard Contractors, Inc.,* No. 11-1453, 2012 WL 2407784, at *4 (E.D. La. June 25, 2012) ("[T]he question of breach is a factual one to be left to the fact-finder, here the jury.").

reasonable care from the jury.

GAF contends that the problems that have been identified with the roof could not have been observed during GAF's inspection because "they involve the substrate and wood nailers into which fasteners were installed that were not visible after the roof was installed."[149] But Luling's evidence—which must be construed in Luling's favor—contradicts GAF's assertion. Luling offered testimony acknowledging the many ways in which a proper inspection would have identified issues with the substrate and wood nailers, along with other installation deficiencies, without destructive testing or dismantling the installation. Mr. Whitman could have, for example, talked to the building owner, asked to see the results of certain tests (like core and pull tests), gone inside the building to look and simply moved things out of the way without dismantling them.[150] Afterall, even GAF acknowledges that its inspection should ensure compliance with good roofing practices and local building

---

[149]    ROA.1805, GAF's memorandum in support.

[150]    ROA.2314-2315, Schaack depo. (recognizing nondestructive, non-dismantling things that can be done but claiming that it was not GAF's responsibility to complete these tasks); ROA.2343-2344, Fischer depo. ("[T]hey [GAF] could've asked to show them the cores or photographs of the roof cores. . . . [T]hey could've asked for pull test results. They could've gone inside. Without – without doing any destructive tests, [Whitman] could've gone through the building to see what was underneath the alleged or the existing wood deck, knowing that a wood deck . . . is not a proper deck on a nursing home. And to see if there was something else underneath there."); *see also* ROA.2344-2345, 2349, Fischer depo.

codes.[151] And even GAF acknowledges that the resulting guarantee that it issued to Luling was a representation that the roof had been inspected and GAF had determined that it complied with good roofing practices and local building codes.[152]

Yet GAF's corporate representative confirmed that it informs its GAF "certified applicators"—like One Source—that they need to take cores of underlying roofing materials and need to provide pull tests results.[153] GAF likewise instructs its contractors to follow local building codes. That includes, among other

---

[151] *E.g.*, ROA.2286, GAF depo. (Harris) (acknowledging that the specifications indicate that an installation should be done in accordance with all applicable building codes); ROA.2293, GAF depo. (Harris) ('Should a GAF field services representative observe conditions on the job site but do not conform with the requirements of this manual or standard good roofing practices such conditions will be brought to the attention of the roofing contractor.' You see that? A. I do. Q. . . . Shouldn't we expect the field services representative to note noncompliance with the manual or specifications, isn't that a -- an expectation? A. It is an expectation. . . . Q. The representative ought to be trained enough to note non-compliance, right? A. Yes.").

[152] ROA.2291, GAF depo. (Harris) ("Q. [T]hat's appropriate, right, that a guarantee should not be issued if the work doesn't comply either with the manual or the specification? A. Yes."); ROA.2291-2292 ("Q. [That a guarantee was issued] tells us at least that GAF believed that the work was in compliance with the manual or the specifications? A. They met the acceptable minimum standard, yes. Q. . . the acceptable minimum standards contained in the manual or the specification? A. Yes."); ROA.2370-2371, Collet depo. ("Q. Who told you [that Bobby Whitman inspected the roofing system and advised that the installation was performed to GAF standards]? A. Bobby Whitman. Q. He personally told you that he inspected the roofing system and that it was performed to GAF standards? A. Yes.").

[153] ROA.2289, GAF depo. (Harris) ("We inform them they need to provide pull test results . . . ."); ROA.2290, GAF depo. (Harris) ("Q. Okay. GAF teaches contractors that they need to, in order to comply with good building practice, take cores to see what the underlying roofing material is? A. We don't—teach them. We inform them.") (omitting form objection).

47

things, ensuring that there are no more than two roofs on the building at a time.[154] Where, as here, a contractor does *not* take cores of the underlying roof materials as GAF has informed it to do, that could amount to them "neglecting their due diligence" and "can preclude them from [GAF] warranty issuance."[155] And One Source acknowledged that it is to follow GAF's "guidelines."[156] But despite GAF informing its applicator that it should do all of those things, Mr. Whitman checked on none of those things, asked for no core or pull tests (which had *not* been performed), and issued a warranty confirming compliance despite a lack of compliance with all of those things.

There can be no credible argument (and certainly no undisputed one) that the installation was properly done. GAF roofing expert Mr. Schaack's investigation confirmed that the roof installed by One Source and inspected by GAF did *not* meet GAF specifications. The roof deck did not have the proper pull out resistance (or "bite") for fasteners, there were multiple layers of roofing on the structure (a violation of both building code and GAF guidelines), the wood nailers were deteriorated or nonexistent, and the roofing membrane was attached to an

---

[154]   ROA. 2288, GAF depo. (Harris).

[155]   ROA. 2290, GAF depo. (Harris).

[156]   ROA.2272, La Vine depo.; *see* ROA.2245, One Source Roofing depo. (La Vine is the person "most knowledgeable about" the relationship with GAF).

inadequate substrate.[157] After Luling's damage, GAF revoked its guarantee.[158] And One Source is not aware of *any other roofs* it installed having failed during Hurricane Ida.[159] Roofs do not just catastrophically fail[160]—as Luling's did—absent deficient installations like this one premised on error upon error: errors that GAF's inspection failed to note and failed to direct One Source to correct. GAF's own expert—who has never had a roof that he installed come off[161]—agreed that he would not have approved it:

> Q. . . . Am I going out on a limb if I say you would never want your name on this job as a roofing contractor?
>
> A. That is not what we do.
>
> Q. And, therefore, you wouldn't want your name associated with it?
>
> A. That's correct.[162]

---

[157]     ROA.2309-2311, ROA.2317-2321, Schaack depo.; *see also* ROA.2288, GAF depo (Harris), (acknowledging against building codes and good building practice to have more than two roofs on a building at one time).

[158]     ROA. 2297, GAF depo. (Harris).

[159]     ROA.2249, One Source Roofing depo. (Wedding), depo.

[160]     ROA.2266, Whitman depo. (doesn't recall any catastrophic failures prior to the one at issue here).

[161]     ROA.2306, Schaack depo. ("Q. Something tells me that a roof put on by Karl Schaack has never come off, even with significant wind; am I right? A. That is correct. Q. And that is because you follow good roofing practices? A. That is correct.").

[162]     ROA.2320, Schaack depo. (omitting form objection); ROA.2318 ("That is not good roofing practice we are looking at right there, huh? A. Correct.").

Mr. Schaack recognized, among other things, that it was inappropriate to attempt to install fasteners into deteriorated nailers or substrates.[163]

GAF should have recognized these issues, but it didn't, and its inspection was deficient. The district court gave GAF a free pass because it unilaterally claimed that its goal was to conduct a "surface inspection" only.[164] It was error to credit the evidence that way in GAF's favor and that error led the court to disregard Luling's evidence of breach. In other words, the district court found Luling's evidence of breach irrelevant because a so-called "surface inspection" could not have detected deficiencies.

But there was no undisputed evidence that GAF could unilaterally limit its duty to conduct only a surface inspection, no undisputed evidence as to what the term "surface inspection" means,[165] and no undisputed evidence that GAF performed a reasonably prudent inspection (surface inspection or not).

A reasonable juror could find that GAF failed to inspect the roof installation in a reasonably prudent manner. *That is all Luling needed to show to survive summary*

---

[163]    ROA.2307-2308, Schaack depo. ("Karl Schaack would not have attempted to fasten the perimeter into wood nailers such as the one that you saw? A. We would not have, no."); ROA.2312-2313 ("Q. . . . Attempting to install fasteners into deteriorated nailers or substrates was inappropriate here; agreed? . . . A. Yes.").

[164]    ROA.7509, order granting motion for summary judgment.

[165]    *See* ROA.7624-25, hearing transcript (discussing that a "surface inspection" means the inspection does not involve dismantling the roof).

*judgment.* The district court erred by working from the wrong premise of crediting GAF's narrowing of the scope of its inspection. But operating from the correct premise that GAF's inspection may not be narrowed in that way and viewing all evidence in favor of Luling, GAF breached its duty to inspect the roof and confirm that the installation met GAF specifications and good roofing practices.

## VI.   CONCLUSION

GAF sent its employee to inspect the roof installation. When it undertook that task, it had a duty to inspect the roof in a reasonable and prudent manner. Under *Malta*, GAF had no ability to unilaterally and retroactively narrow the scope of its own duty. But that is precisely what the district court allowed GAF to do. And that led to an incorrect result. At a minimum, disputed facts and credibility determinations precluded summary judgment for GAF.

As for whether GAF breached its duty, that, too, was tainted by the district court's mistaken conclusion that GAF got to narrow the parameters of the inspection. It should not have done so, and the factual question of breach should have been resolved by a jury.

The district court erred in granting GAF's motion for summary judgment. This Court should reverse.

Respectfully submitted,

/s/ Harold J. Flanagan

| | |
|---|---|
| Michael A. Mahone (#32567) | Harold J. Flanagan (#24091) |
| THE MAHONE FIRM LLC | Thomas M. Flanagan (#19569) |
| 5190 Canal Blvd., Suite 102 | James H. Gilbert (#36468) |
| New Orleans, LA 70124 | Gabrielle A. Ball(#39111) |
| Telephone: (504) 564-7342 | FLANAGAN PARTNERS LLP |
| mike@mahonefirm.com | 201 St. Charles Avenue, Suite 3300 |
| | New Orleans, Louisiana  70170 |
| | Telephone: (504) 569-0235 |
| | hflanagan@flanaganpartners.com |
| | tflanagan@flanaganpartners.com |
| | jgilbert@flanaganpartners.com |
| | gball@flanaganpartners.com |

Counsel for Plaintiffs-Appellants St. Charles-Guillot Investment, LLC
and Luling Living Center, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing brief was served upon all counsel of record this 20th day of August, 2025, by e-filing same into the CM/ECF system, which will automatically deliver a copy of same to all counsel.

/s/ Harold J. Flanagan

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14 point, Equity Text A font.

/s/ Harold J. Flanagan